**UNITED STATES of America, Plaintiff,**

v.

**Lowell M. BIRRELL, Defendant.**

**No. 61 Cr. 692.**

United States District Court
S. D. New York.

May 27, 1968.

See also D.C., 286 F.Supp. 869.

Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, for plaintiff, Arthur L. Liman, Stephen L. Hammerman, Stephen F. Williams, New York City, of counsel.

The Legal Aid Society, for defendant, Edward Q. Carr, Anthony F. Marra, Leonard H. Sandler, Stephen Singer, New York City, of counsel.

## OPINION

HERLANDS, District Judge.

THE COURT: Presently before the Court is a motion by The Legal Aid Society to be relieved as assigned counsel for Lowell M. Birrell, the defendant herein. The current motion by the Society to be relieved has been joined in

by defendant in the sense that he also seeks to have the Society terminate its representation of him. For the reasons hereinafter set forth in detail, the Court denies the Society's motion.

## THE FACTUAL BACKGROUND

The matters now before the Court represent an extraordinary proceeding in an extraordinary case. It would be intellectually impossible to appreciate the implications of the matters before the Court and the significance of the arguments propounded in connection therewith without a full comprehension of and insight into the defendant's course of conduct throughout the entire history of this case, the indictment in which has been pending since July 20, 1961.

From October 5, 1957 to April 23, 1964—a period of six and one-half years—defendant was outside the United States. During this period, the trial of the indictment was delayed almost three years.

After defendant's return to the United States, the trial of the indictment was further delayed over three years. Most of this delay was attributable to defendant's "numerous and, in some respects repetitive, motions or his temporary inability to proceed because of change of counsel." United States v. Birrell, 276 F.Supp. 798, 821 (S.D.N.Y.1967).[1] The case went to trial on December 4, 1967; and, on December 28, 1967, the jury found defendant guilty on ten counts of selling unregistered securities and one count of conspiracy. Birrell has not yet been sentenced because several post-conviction proceedings, which he has initiated, have not yet been heard and determined.

When Birrell returned to this country in 1964, he was assigned counsel by the Court. Since that date he has been represented continuously by court-appointed counsel: first, by Mr. William B. Pennell, who served from May 8, 1964 to October 27, 1965; then by Mr. William J. Brennan, who served from November 8, 1965 to June 29, 1967; then by Mr. Charles N. Brower, who served from June 29, 1967 to January 4, 1968;[2] and since then exclusively by The Legal Aid Society. Mr. Martin Portnoy of The Legal Aid Society, who had worked as co-counsel with Mr. Brower from June, 1967 through the trial, remained in the case. In view of the nature of the post-conviction proceedings, The Legal Aid Society secured the services of Mr. Leonard Sandler as senior counsel, Mr. Steven Singer as investigator and junior attorney, and Mr. Stuart GraBois as investigators.[3] In addition, the Society hired stenographic assistance when needed.

Mr. Sandler and his associates from The Legal Aid Society have rendered effective and zealous representation to defendant in the post-verdict proceedings. The Court bases this conclusion on a close examination of the written and oral presentations made by defense counsel. In arguing motions, conducting cross-examination and submitting memoranda of law and affidavits, Mr. Sandler's work has been of high quality.

Moreover, Mr. Sandler has had long and extensive experience as a trial lawyer in criminal matters. He was admitted to the New York Bar in 1950 and served first as law clerk to Chief Judge Sylvester J. Ryan of this Court from 1950 to 1951, and then as law secretary to Mr. Justice Bernard Shientag of the

1. Further background and history of this litigation may be found in this Court's opinion in United States v, Birrell, 276 F. Supp. 798, 804–808, 827–833 (S.D.N.Y. 1967).

2. Mr. Brower was assisted by court-assigned co-counsel namely The Legal Aid Society through Mr. Martin Portnoy. In the course of the trial, the Court acting under the Criminal Justice Act arranged to make available to the defense a foreign law expert, a handwriting expert, and an accountant in addition to arranging for the subpoenaing both of foreign and domestic witnesses.

3. Mr. Portnoy remained in the case until March 22, 1968, when he resigned from The Legal Aid Society.

Appellate Division, First Department, until 1952. Mr. Sandler was then associated with Cleary, Gottlieb, Friendly and Hamilton until 1954, when he was appointed as an Assistant District Attorney for New York County. He served as an Assistant District Attorney for nine years in the Homicide and Supreme Court Bureaus, where most of his work consisted of trying felony and homicide cases. Since 1963, he has been in private practice specializing in criminal matters, both on the trial and appellate levels. (Post-Trial Minutes, pp. 441–443).

Mr. Portnoy was admitted to the New York Bar in 1965 and was in private practice for a period of three or four months. In 1966, he joined the staff of the criminal branch of The Legal Aid Society, where, for the next year and one-half, he tried several hundred criminal cases before three-judge panels in the State courts. In June, 1967, Mr. Portnoy was assigned on a full-time basis to the instant case. (Post-Trial Minutes, pp. 443–444).

Mr. Singer was admitted to the New York Bar in 1967. From 1963 to 1967, he was an investigator in the Social Welfare Department of New York City. From June, 1967 to January, 1968, he was a special agent in the Internal Revenue and Intelligence Branch of the Treasury Department. In that position, he received training in investigative techniques. In January, 1968, he joined the staff of The Legal Aid Society and was assigned to the instant case as an investigator and junior attorney. (Post-Trial Minutes, pp. 444–446).

On June 16, 1967, when Mr. Brower and Mr. Portnoy were entering the case as assigned counsel, the Court set the case down for trial on December 4, 1967, thereby giving defense counsel approximately six months to prepare for trial. (Pre-Trial Minutes, pp. 228, 234, 242, 261).

In spite of the fact that the trial of the indictment had been long delayed and that new counsel had been given almost six months to prepare, defendant sought to further delay the proceedings. By petition dated November 17, 1967 and returnable November 27, 1967, defendant petitioned the Court of Appeals for the Second Circuit for a writ of mandamus directing this Court: (1) to hold a pre-trial hearing to determine ownership to approximately one or two million records suppressed for use as evidence against defendant; and (2) to recuse itself from presiding over the trial of this indictment. Oral argument was held on November 27, 1967; and the Court of Appeals by unanimous decision rendered from the bench denied defendant's petition in all respects.

On that same day—November 27, 1967—defendant moved before this Court for an adjournment of the commencement of the trial on the ground that counsel was not prepared to go forward. The Court denied this motion.

On November 28, 1967, defendant applied to the Court of Appeals for a stay of all proceedings pending the filing of a petition for a writ of certiorari with the United States Supreme Court. The Court of Appeals unanimously denied this application.

On November 29, 1967, defendant applied to Supreme Court Justice John M. Harlan, Circuit Justice for the Second Circuit, for a stay of proceedings pending the determination of a petition for a writ of certiorari "to be filed as soon as possible." On December 2, 1967, Mr. Justice Harlan denied defendant's application for a stay of the trial.

On November 30, 1967, defendant's motion to adjourn the trial was renewed and was likewise denied by this Court.

On November 30, 1967—four days before the trial was to commence—Messrs. Brower and Portnoy sought the Court's direction in resolving an undisclosed conflict which had arisen between defendant and his attorneys over the conduct of the defense. Mr. Brower informed the Court that the point in issue was fundamental and central to the case as a whole and was precipitated by the denial of defendant's two motions for

adjournment. (Pre-Trial Minutes, pp. 1201–1206, 1212–1213).

No specification was made by defendant's counsel as to the nature of the dispute, aside from conclusory characterization; no affidavit was filed by defendant's counsel; no formal application or motion was made by defendant's counsel; no statement was made by defendant Birrell; and no affidavit was filed by defendant Birrell.

Extensive proceedings were conducted by the Court on November 30th and December 1st in order to resolve this problem.[4] The Court clarified the issue by making it clear to the defendant that he might either proceed with present court-appointed counsel or proceed pro se if he makes an unequivocal request to act as his own lawyer and intelligently and knowingly waives his right to the assistance of counsel. (Pre-Trial Minutes, pp. 1220–1221).

After conferring with defendant, his lawyer, Mr. Brower, informed the Court that Birrell did not wish to proceed pro se and he wanted Messrs. Brower and Portnoy to continue to be his attorneys. (Pre-Trial Minutes, pp. 1239–1240).

Mr. Brower and Mr. Portnoy then moved to be relieved as counsel to Mr. Birrell because the undisclosed attorney-client conflict as to how to conduct the defense had not been resolved. (Pre-Trial Minutes, pp. 1240–1241).

The Court denied the motion of defense counsel to be relieved. For the guidance of both defendant and counsel, the Court reviewed the leading and relevant authorities dealing with this problem. The Court pointed out that a client cannot, particularly on the eve of trial, manipulate the right to counsel in order to stall the commencement of trial. (Pre-Trial Minutes, p. 1255). Defendant was

instructed that, if he wished to be represented by Messrs. Brower and Portnoy, he would have to behave as a client and abide by the decisions of counsel made in the exercise of their professional judgment. The Court noted that if defendant, a member of the bar since 1930, "wants to act as his own lawyer, then he has the right to do so but he cannot simultaneously and concurrently act as his own lawyer and, at the same time, expect assigned counsel to discharge their professional responsibilities to him." (Pre-Trial Minutes, pp. 1256–1257).

Defendant was informed that "the right to counsel cannot be used as a gambit in a 'cat and mouse game' to frustrate the administration of justice * * *" (Pre-Trial Minutes, p. 1271). The Court concluded by pointing out that "to permit the case to be adjourned in light of its history and chronology under such circumstances would be an open invitation to other defendants to manipulate the attorney-client relationship so as to forestall a trial." (Pre-Trial Minutes, p. 1272.)

At various times during the trial, defendant attempted to delay the proceedings by seeking adjournment on the ground that counsel was not prepared. Motions were also made for a mistrial on the ground that defendant's right to effective assistance of counsel had been violated.

After the jury verdict was returned on December 28, 1967, Mr. Brower moved to be relieved as assigned counsel. This request was granted on January 4, 1968 and The Legal Aid Society remained in the case as defense counsel. The Court set up a schedule and an agenda for the disposition of the four post-conviction proceedings. The first of these proceed-

---

4. The Court has conducted *ex parte* sessions on attorney-client problems, the minutes of which have been impounded in order to avoid any prejudicial disclosure to the Government of matters possibly affecting defense strategy in any of the pending or future proceedings herein. Such portions of said impounded minutes that are disclosed in this opinion, however, do not reveal defendant's position with regard to any of the litigated issues or issues to be litigated in the post-conviction proceedings, and, hence, no prejudice can result to the defendant by the *pro tanto* disclosure as reflected in the course of this opinion.

ings was the so-called taint hearing: an evidentiary hearing in which the Government would have to prove the constitutional purity of the evidence it offered at trial. This hearing was necessitated by Judge Wyatt's order of June 11, 1965 suppressing for use as evidence records that were seized from defendant on August 22nd and 24th, 1959. United States v. Birrell, 242 F.Supp. 191, 201 (S.D. N.Y.1965). On May 23, 1967, this Court had ruled that the so-called taint hearing should take place post-trial in the then suppositious event that defendant was convicted. United States v. Birrell, 269 F.Supp. 716, 725 (S.D.N.Y.1967).

In view of the entrance of Mr. Sandler into the case as new senior counsel and the need for him to become familiar with the trial record, motion papers and the case as a whole, the Court arranged to have the Government fully disclose its direct case in advance to the defense. All objections except those as to the form of the question would be reserved and the taint hearing would be adjourned for a substantial and reasonable amount of time to allow the defense an opportunity to prepare for cross-examination. The exact length of the adjournment needed to prepare for cross-examination would be determined after the presentation of the Government's case and would be "reasonable and adequate judged by the most generous standards." (Post-Trial Minutes, p. 257). At the conclusion of defendant's cross-examination of the Government's witnesses, the Court would determine what additional adjournment of the taint hearing would be necessary to enable defendant to be prepared to present his direct or rebuttal case. (Post-Trial Minutes, pp. 1245–1244).

The Government presented its direct case in the taint hearing on February 20th, 21st and 23rd. The defense was given an adjournment until April 8th—a period of over six weeks—to prepare its cross-examination.

Even though the defense was given full disclosure of the Government's case,

extensive discovery and inspection and a lengthy adjournment to prepare for cross-examination, they still sought an additional adjournment on the ground that defense counsel was not prepared to proceed. The Court denied this motion.

On February 19, 1968—one day before the taint hearing was to commence—defendant moved to have The Legal Society relieved as court-appointed counsel. The Court conducted lengthy hearings—most of which were held in the absence of the Government—on February 19th and 20th with regard to defendant's application.

During these proceedings, defendant made it crystal-clear that while he had high regard for the ability, intelligence and articulateness of Messrs. Sandler and Singer (Post-Trial Minutes, pp. 408, 415, 470), what he wanted was a Wall Street lawyer, who "don't have to make a living," who was willing to work nights, weekends and holidays on this case, and on this case only, and who had extensive stenographic facilities at his disposal. (Post-Trial Minutes, pp. 508–509, 527). Defendant also made it clear that he had disagreed with counsel—both past and present—as to how the defense should be conducted and that he wanted counsel to follow his advice as to strategy and tactics, rather than adhere to their own professional judgment. (Post-Trial Minutes, pp. 402, 418, 485, 497, 499–500, 500–507). For example, defendant pointed out that he had specifically instructed Messrs. Brower and Portnoy not to proceed with the case and that this was the attorney-client problem that had arisen on the eve of trial. (See also defendant's affidavit, sworn to March 7, 1968, paragraph 12).

The Court denied defendant's motion to have counsel relieved and concluded that Birrell had received and would continue to receive dedicated, aggressive and effective legal representation.

After the denial of defendant's motion to have The Legal Aid Society relieved as counsel, Mr. Sandler and his

associates continued to prepare for and participate in the taint hearing. Defendant, however, repeatedly quarreled with counsel over how to conduct the defense and began submitting on his own, without the knowledge or consent of counsel, letters and affidavits to the Court. This correspondence contains many unflattering, derogatory comments concerning Mr. Sandler's professional abilities and loyalty to his client as well as scurrilous accusations concerning the Court's fairness and impartiality. Similar intemperate outbursts were made on the record; and defendant has frequently acted in a rude and discourteous manner to counsel.

In addition, defendant has sent letters to Circuit Judge Harold R. Medina and Chief Judge Sugarman of this Court in which various accusations were made against the Court and other District Court and Circuit Court Judges. This correspondence is discussed in greater detail in the Court's opinion on defendant's motion for bail, which is also being rendered today.

An examination of the record clearly shows that defendant wishes to act as his own lawyer and not as a client; and that he further wishes to disrupt the proceedings. The following examples are illustrative:

(1) On March 20th Mr. Sandler stated: "I think I have been distracted by some of the anxieties relating to the relief of counsel and the frequent bickering with my client and his views, which are very strongly expressed and represent his heartfelt interest and point of view as to what counsel must do first and must do then, and if they don't do it, how terrible, and so forth it will be." (Post-Trial Minutes, p. 1176).

(2) After defendant had mailed to the Court certain letters and an accompanying affidavit, Mr. Sandler stated on April 8th: "My feeling is that both the letter and the accompanying affidavit basically involve a sharp difference of opinion between Mr. Birrell and myself as to the suitability of filing this supplemental affidavit. My view was that it was not to be filed; Mr. Birrell felt it should be filed; and he took this means of bringing it to your Honor's attention with accompanying remarks about myself." (Post-Trial Minutes, p. 1603).

Indeed, defendant's supplemental affidavit, sworn to March 7, 1968, concludes with the following sentence:

"I feel I should also state that Mr. Sandler went over this affidavit briefly with me and it does not have his approval."

(3) On April 10th defendant stated: "I don't want any counsel waiving any of my rights and I don't want any counsel making concessions or admissions affecting me." (Post-Trial Minutes, p. 1873).

(4) On April 29th, Mr. Sandler stated: "I can't have a conversation with the defendant in which I say what I think without that opinion being reported in a communication to the Court in a form that is not always accurate." (Post-Trial Minutes, pp. 2169–2170).

The taint hearings, which had been adjourned on February 23rd, were resumed on April 8th in order to enable the defense to cross-examine the Government's witnesses. Cross-examination took place on April 8th and 9th.

On April 10th, defendant made an application to relieve The Legal Aid Society and to proceed *pro se*. The Court proceeded circumspectly and conducted an inquiry of defendant in conformance with the guidelines laid down in United States ex rel. Maldonado v. Denno, 348 F.2d 12 (2d Cir. 1965), and in United States v. Plattner, 330 F.2d 271 (2d Cir. 1964), to make certain that defendant was making an intelligent, knowing and unequivocal choice to proceed *pro se*. Defendant stated that he was making such an unequivocal request to act as his own lawyer. (Post-Trial Minutes, pp. 1881, 1899–1900).

Because defendant complained that he had severe headaches for which he was then taking a Darvon compound and that he had said on a prior occasion that he

was unable to remember what had occurred at that prior proceeding, the Court was of the opinion that defendant should be given a medical examination by a competent general practitioner to determine whether he was physically able to conduct his own defense. Defendant and his counsel consented, and the physical examination was conducted on April 11th.

On April 15th, another hearing was conducted on defendant's request to proceed *pro se*. Counsel were informed that defendant had refused to let the examining physician disclose his medical history. The only item of the medical history that the doctor was permitted to disclose was: "There is also a history of narcolepsy, which causes the patient to fall asleep periodically for brief intervals." The doctor added, however, that: "I observed no such attack during my examination." (Post-Trial Minutes, p. 1925). The examining physician concluded that: "I see no reason why this patient, who is an attorney, could not conduct his own trial." (Post-Trial Minutes, p. 1926).

In order to ascertain whether defendant's alleged narcolepsy—not substantiated by specific medical history or diagnosis—would impair his ability to act effectively as his own counsel, the Court directed defendant to take the stand and answer under oath material, relevant and competent questions relating only to his medical history of narcolepsy. The Court stated that defense counsel would be permitted to make objections to any questions that were regarded as improper.

Defendant, however, refused to take the stand and answer questions under oath with regard to his narcolepsy. He stated that he would not accept rulings of the Court as to what questions were material and relevant and that he could not accept the Court as the arbiter in this proceeding. (Post-Trial Minutes, pp. 1955–1964, 1972–1974, 1975–1982). Because the Court was unable to determine whether defendant was medically able to conduct his own defense, defend-

ant's motion to relieve assigned counsel and to proceed *pro se* was denied (Post-Trial Minutes, p. 1986).

On April 17, 1968,—after defendant's application to proceed *pro se* had been denied by this Court—Birrell commenced a lawsuit against The Legal Aid Society, and Leonard Sandler and Edward Q. Carr, Jr. individually, in the New York State Supreme Court, seeking $25,000,-000 damages. The one-page complaint alleges that "defendants have been guilty of gross negligence, malpractice, violation of professional ethics, and other improper acts and practices." Aside from these vague conclusory allegations, there are no specific allegations of misconduct or negligence pleaded in the complaint.

By notice of motion dated April 18, 1968, The Legal Aid Society moved to be relieved as assigned counsel. This motion is now before the Court for decision.

The Society based its application "upon the ground that it has become impossible for our staff to serve as counsel for Mr. Birrell because of sharp and recurring differences which have arisen between defendant and ourselves over the conduct of his defense, the behavior of defendant in discussing the proceedings with a stream of verbal and written abuse of the lawyers attempting to represent him, and because Mr. Birrell has commenced an action in the Supreme Court, New York County, against The Legal Aid Society and Messrs. Carr and Leonard H. Sandler * * *" (Affidavit of Edward Q. Carr, Jr. and Anthony F. Marra, sworn to April 19, 1968, pp. 1–2). In The Society's view, "This last action of Mr. Birrell, in the context of our recurring differences with him, has cast his counsel and himself in the roles of adversaries during the conduct of these proceedings and has rendered it completely impossible for any lawyer associated with the Society to continue as his attorney." (Carr and Marra affidavit, p. 4).

On April 22, 1968, the Court reopened consideration of defendant's request to

proceed *pro se*. Defendant once again refused to answer questions concerning his alleged condition of narcolepsy. (Post-Trial Minutes, pp. 2095–2103). He further stated that he was longer requesting to proceed *pro se*. (Post-Trial Minutes, p. 2104). The following colloquy took place:

"THE DEFENDANT: * * * It was no small decision on my part to agree to go ahead and represent myself under conditions that I wasn't able to foretell what they would be, as far as assistance, as far as mechanical assistance, as far as facilities, as far as getting access to things were concerned. I decided that it wouldn't happen, and I took the chance to what I would say in vulgar language, call a bluff.

"THE COURT: You took a chance on what?

"THE DEFENDANT: On the fact that it wouldn't happen.

"THE COURT: What wouldn't happen?

"THE DEFENDANT: That I wouldn't be given the opportunity."
(Post-Trial Minutes, pp. 2108–2109).

The Court, acting pursuant to its inherent power, then ordered that a physical and psychiatric examination of the defendant be conducted.[5] Decision on the matter of representation was deferred pending the completion of this examination. (Post-Trial Minutes, pp. 2109–2111).

On April 30, 1968, the Court signed an order transferring defendant to the Bellevue Hospital Center to be examined by an eminent psychiatrist in order to get an expert opinion as to "whether defendant Lowell M. Birrell is psychologically and physically able to manage the conduct of his case and to represent himself in all future proceedings herein." This procedure was carried out with the consent and assistance of defense and

5. In addition to the circumstances already noted in this opinion, there are other facts that most suggestively indicated to the Court that defendant should receive a complete physical and psychiatric examination before the Court proceeded further with questions concerning defendant's requested release on bail and defendant's legal representation, including the possibility of his proceeding *pro se*. These additional factors include the following:

(1) An exhibit submitted by defendant himself in connection with his bail motion established that Dr. Usategui, his Cuban doctor, had ordered psychotherapy for defendant in October, 1957 (Deposition of Dr. Agosto Usategui Y Lezama, February 16, 1959, Answers 60, 79, 141, 142, annexed as Exhibit "H" to the affidavit of Martin Portnoy, sworn to February 5, 1968).

(2) Assigned counsel herein had requested the Court for "permission to have the defendant, Lowell M. Birrell, examined by Dr. Burton Nackenson, a qualified psychiatrist, who has acted as a consultant to the Legal Aid Society for some time * * *" (letter of Leonard H. Sandler, Esq. to the Court, dated March 25, 1968). On March 27, 1968, Mr. Sandler said: " * * * I believed it would be helpful to have somebody who was professionally qualified to act, in effect, as a consultant on this matter, some qualified psychiatrist, talk to him and advise me with regard to his overall situation." (Post-Trial Minutes, March 27, 1968, p. 1334). On March 27, 1968, the Court granted permission to counsel for such an examination (Post-Trial Minutes, pp. 1351–1352). However, because of certain conditions imposed by defendant, the examination never took place (Post-Trial Minutes, pp. 1846–1853).

(3) The defendant, in a letter received by the Court on April 2, 1968, stated that his counsel allegedly had said that the defendant was "psychopathic" and "sick in the head" (Post-Trial Minutes, p. 1600). Previously, on March 27, 1968, the defendant stated: " * * * Mr. Singer has on at least three occasions told me unequivocally that I was sick in the head and had a sick mind." (Post-Trial Minutes, p. 1332). Mr. Singer denied having made those statements (Post-Trial Minutes, p. 1333). In a letter dated April 8, 1968, addressed to this Court and received on April 15, 1968, the defendant enclosed a typed "Memorandum for Counsel," on page 3 of which the defendant wrote in longhand the following marginal note: "Mr. Singer has since told me that his recollection does not agree with mine. I accept his statement and his integrity. LMB."

Government counsel. The order was executed on May 1, 1968. On May 10, 1968, the Court signed a supplementary order extending defendant's commitment to the Bellevue Hospital Center until May 21, 1968.

Since his commitment to Bellevue Hospital, defendant has refused to submit to a physical examination or to any questioning by the doctors on the grounds that the Court's order is unconstitutional and that he is being deprived of his constitutional right to the effective assistance of counsel. In addition, he has threatened to sue the hospital authorities.

### THE APPLICABLE LAW

▮ The Sixth Amendment mandates that an indigent defendant in a criminal prosecution has a right to court-appointed counsel. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Counsel must be effective to satisfy constitutional requirements. Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). However, effective counsel is "not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance." Mackenna v. Ellis, 280 F.2d 592, 599 (5th Cir. 1960).

▮▮ Nevertheless, it is clear that the right to counsel may not be manipulated to delay proceedings and obstruct the fair and orderly administration of criminal justice. United States v. Bentvena, 319 F.2d 916 (2d Cir.), cert. denied sub nom., Ormento v. United States, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963); United States v. Llanes, 374 F.2d 712 (2d Cir.), cert. denied, 388 U.S. 917, 87 S.Ct. 2132, 19 L.Ed.2d 208 (1967); United States v. Abbamonte, 348 F.2d 700 (2d Cir. 1965), cert. denied, 382 U.S. 982, 86 S.Ct. 557, 15 L.Ed.2d 472 (1966); Cleveland v. United States, 116 U.S.App.D.C. 188, 322 F.2d 401 (D.C.Cir.), cert. denied, 375 U.S. 884, 84 S.Ct. 157, 11 L.Ed.2d 114 (1963); United States v. Burkeen, 355 F.2d 241 (6th Cir.), cert. denied sub nom., Matlock v. United States, 384 U.S. 957, 86 S.Ct. 1582, 16 L.Ed.2d 553 (1966); Leino v. United States, 338 F.2d 154 (10th Cir. 1964); United States v. Terranova, 309 F.2d 365 (2d Cir. 1962). Defendant in a criminal proceeding may not use the right to counsel to play a "cat and mouse" game with the Court, Releford v. United States, 309 F.2d 706 (9th Cir. 1962); he may not "by ruse or stratagem fraudulently seek to have the trial judge placed in a position where, in moving along the business of the court, the judge appears to be arbitrarily depriving the defendant of counsel. More particularly is this so when, during trial, the defendant discharges his counsel." United States ex rel. Davis v. McMann, 386 F.2d 611, 618–619 (2d Cir. 1967).

▮ Counsel—whether retained or appointed—and not the client is the manager of the lawsuit. Decisions as to tactics and strategy are the sole responsibility of counsel, in the exercise of his professional judgment. There is no requirement that an attorney stultify himself by making meritless arguments or motions. A defendant in a criminal case does not have a constitutional right to an attorney with whose advice he agrees. "[F]ew competent counsel would accept retainers, or appointment under the Criminal Justice Act of 1964, to defend criminal cases, if they were to have to consult the defendant, and follow his views, on every issue of trial strategy that might, often as a matter of hindsight, involve some claim of constitutional right." Nelson v. People of State of California, 346 U.S. 73, 81 (9th Cir.), cert. denied, 382 U.S. 964, 86 S.Ct. 452, 15 L.Ed.2d 367 (1965); Williams v. Beto, 354 F.2d 698, 705 (5th Cir. 1965); Wood v. United States, 357 F.2d 425, 428 (10th Cir.), cert. denied, 385 U.S. 866, 87 S.Ct. 129, 17 L.Ed.2d 94 (1966); Jackson v. United States, 258 F.Supp. 175, 183–184 (N.D.Tex.1966), aff'd, 384 F.2d 375 (5th Cir. 1967); Arellanes v. United States, 326 F.2d 560, 561 (9th Cir. 1964).

Although waivers of constitutional rights are not favored, an accused may waive his constitutional right to the assistance of counsel "if he knows what he is doing and his choice is made with eyes open." Adams v. United States ex rel. McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1943); Johnson v. Zerbst, 304 U.S. 458, 468–469, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). See also Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (April 23, 1968). Moreover, defendant's conduct may constitute a rejection of counsel and a waiver of the right to the assistance of counsel. Glenn v. United States, 303 F.2d 536, 540–541 (5th Cir. 1962), cert. denied sub nom., Belvin v. United States, 372 U.S. 922, 83 S.Ct. 737, 9 L.Ed.2d 726 (1963); Nunn v. Wilson, 371 F.2d 113, 117–118 (9th Cir. 1967); Arellanes v. United States, 302 F.2d 603, 610 (9th Cir. 1962); Leino v. United States, 338 F.2d 154, 156 (10th Cir. 1964).

The decisional law in this Circuit has recognized that a defendant in a criminal case has the right to waive the assistance of counsel and represent himself *pro se*. In order to invoke that right, the defendant must make an unequivocal request to act as his own lawyer. United States v. Plattner, 330 F.2d 271 (2d Cir. 1964); United States ex rel. Maldonado v. Denno, supra, 348 F.2d at 15–16.

While the right to proceed *pro se* is unqualified if exercised before trial, this right is "sharply curtailed" after the trial has commenced with defendant being represented by counsel. "There must be a showing that the prejudice to the legitimate interests of the defendant overbalances the potential disruption of proceedings already in progress, with considerable weight being given to the trial judge's assessment of this balance." United States ex rel. Maldonado v. Denno, supra, 348 F.2d at 15.

It should be noted that the same standard is applicable when defendant attempts to discharge his counsel during trial. United States ex rel. Davis v. McMann, supra, 386 F.2d at 619.

An examination of defendant's conduct throughout the litigation leads to the ineluctable conclusion that he has attempted to manipulate his constitutional right to counsel in order to delay and disrupt the proceedings, particularly the taint hearing. Defendant's oft-repeated assertion that counsel is unprepared to go forward and his requests that new counsel be appointed are the vehicles which are employed to further deaccelerate these already long-delayed proceedings.

It is not merely coincidental that on the eve of both the trial and the taint hearings, attorney-client problems arose. Defendant's demand four days before the trial was to commence that Messrs. Brower and Portnoy not proceed with the trial was a last minute attempt to delay the trial. Similarly, defendant's request to have The Legal Aid Society relieved as counsel one day before the taint hearing was to commence was an attempt to delay and disrupt that proceeding. As Judge Friendly pointed out in United States v. Llanes, supra: "Judges must be vigilant that requests for the appointment of a new attorney *on the eve of trial* should not become a vehicle for achieving delay." (374 F.2d at 717) (Emphasis added.)

Moreover, defendant has attempted to manipulate his right to counsel in order to create synthetic error for the purpose of appeal. Defendant's *pro se* application is a good example of this stratagem. Even though defendant asserted that he wished to proceed *pro se* on April 10th, he refused to take the stand and answer material and relevant questions concerning the medical history of his alleged and unsubstantiated condition of narcolepsy and, in addition, refused to allow the examining physician to reveal to the Court his medical history. Unable to determine whether defendant was physically able to manage his own defense, the Court had no choice but to deny defendant's request. It is clear that de-

fendant's maneuvers were an attempt to make it appear that the Court was arbitrarily denying his application to represent himself. Defendant's subsequent admissions that he had only been calling the Court's bluff at the time of the application to proceed *pro se* and that he no longer wished to represent himself clearly show that he is playing a "cat and mouse" game with the Court and is trifling with the administration of justice.

The Court is aware that differences exist between client and attorney in this case. Senior counsel, Mr. Sandler, has desired to proceed expeditiously and obtain an adjudication on the issues on which there is any possibility of the defendant's prevailing. On the other hand, defendant has desired to delay a resolution of the basic issues and, instead, to create a multitude of collateral and peripheral proceedings thereby diverting and delaying the resolution of the controlling issues.

Added to this, there are differences of temperament. Counsel conducts himself in a quiet manner and is deferential and respectful to the Court, confining himself to a skillful presentation of the issues involved. Defendant, on the other hand, would prefer an attorney who is more strident, more overtly aggressive and who engages in "judge-baiting."

Defendant does not wish to behave as a client and seeks to dictate the defense rather than rely on the professional judgment of counsel as to tactics and strategy. Moreover, he desires that his attorneys be mere functionaries reporting their every move, submitting written reports and conferring with him daily.

Defendant's counsel, on the other hand, feel that their time can be put to better use by analyzing the many records and documents that have been and will be turned over to them, pursuant to the Court's Order of April 16, 1968 (Post-Trial Minutes pp. 2065–2073) and the supplemental direction of the Court of April 29, 1968 (Post-Trial Minutes, pp. 2167–2168).

In addition, defense counsel feel that their time can be effectively utilized by studying the testimony of the Government's witnesses in the pending taint hearing in order to prepare for further cross-examination and to develop other evidence that might invalidate the Government's case. It is obvious that defense counsel feel that daily reports to and daily conferences with defendant are not the best way to prepare for these proceedings.

Defendant intentionally distorts and perverts this seeming lack of communication between himself and defense counsel when, in fact, counsel are busily working on phases of the case which, in their judgment, have greater priority. He has quarreled repeatedly with counsel as to the handling of the defense and has made applications and sent letters to the Court without their knowledge or consent. In addition, he has treated counsel in a disrespectful manner. It is the Court's considered opinion that defendant has deliberately attempted to create a situation where it would be extremely difficult for any self-respecting lawyer to represent him.

Defendant's lawsuit against The Legal Aid Society is his most recent attempt to utilize the right to counsel in order to delay and disrupt the pending proceedings. Unable to have The Legal Aid Society relieved as counsel by "conventional" means, defendant has sought to achieve the same result through the device of a lawsuit against the Society. This action by defendant is the primary ground upon which The Legal Aid Society's motion to be relieved is premised.

■ Generally speaking, a lawsuit by a client against his lawyer may be considered as an automatic and effective termination of the attorney-client relationship. But to say that this result follows inevitably is to use a "doctrinaire, knee-jerk application" (cf. Ginsberg v. State of New York, 390 U.S. 629, 88 S. Ct. 1274, 20 L.Ed.2d 195 (April 22, 1968) (concurring opinion)) of the general principle that there must be a relationship of trust and confidence between at-

torney and client. The judicial process would be robbed of the flexibility so necessary for the practical administration of criminal justice if it were held that a defendant—who has failed by regular means to persuade the Court to change counsel—can successfully use the ploy of suing his own attorney in order to force the Court to accede to his demand for new counsel.

In Swope v. McDonald, 173 F.2d 852 (9th Cir. 1949) (en banc), the defendant had lodged a malpractice charge against his attorney before the Michigan Bar Association. Despite the pendency of the complaint and the desire of defendant that the attorney not defend him, the attorney represented defendant at the trial. The Court of Appeals for the Ninth Circuit held that defendant had not been denied effective assistance of counsel. The Court concluded that the attorney's interest was not adverse to that of his client because the "complaint against him was so palpably groundless that its prosecution could not have given him concern." (173 F.2d at 855).

The rationale of Swope v. McDonald is applicable to the instant case. Defendant's one-page complaint which seeks $25,000,000 in damages contains merely vague generalized conclusory allegations —i. e. "defendants have been guilty of gross negligence, malpractice, violation of professional ethics, and other improper acts and practices." The Court is convinced beyond cavil that defendant's suit is frivolous and a contrivance to have The Legal Aid Society relieved as counsel. The complaint is "so palpably groundless" that its filing will not impair to the slightest extent The Legal Aid Society's ability to continue to provide defendant with effective legal representation. The initiation of the lawsuit has not created any genuine adversity of interest on the part of the Society, thereby justifying their removal as counsel.

Other actions by defendant impeach defendant's good faith in suing his counsel. On April 20, 1968—three days after the commencement of the $25,000,000 lawsuit—defendant addressed a letter to this Court in which he stated: "He [Mr. Sandler] is very intelligent and articulate; aside from his over apologetic manner he is a capable and persuasive advocate." Defendant added: "I have a strong personal affection" for Mr. Sandler. (Defendant's letter of April 20, 1968 to the Court, p. 4, sworn to before the Court on April 22, 1968, marked as Court's Exhibit III).

It passes belief that defendant is acting in good faith when he hurls an accusation of malpractice and gross negligence against an attorney whom he holds in such high esteem.

Indeed, defendant's lack of good faith in suing The Legal Aid Society is manifested by the fact that on April 29th he addressed a letter to Messrs. Carr, Marra, Sandler and Singer containing a number of requests for work to be undertaken by these attorneys immediately in this case. (See Post-Trial Minutes, pp. 2177–2178). It is difficult to reconcile this request by defendant with his $25,000,000 lawsuit against The Legal Aid Society.

Of course, if there were a true—as opposed to a contrived—conflict of interest between attorney and client, the Court would not hesitate to relieve counsel. See, e. g. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1943) (one lawyer represented co-defendants whose interests conflicted); Craig v. United States, 217 F.2d 355 (6th Cir. 1954) (company counsel represented both employee and his employer whose interests conflicted); District of Columbia v. Scott, 94 U.S.App.D.C. 227, 214 F.2d 860 (1954) (defense counsel had represented witnesses who testified against defendant); Berry v. Gray, 155 F.Supp. 494 (W.D.Ky.1957) (defense counsel assisted prosecution in other cases).

■■■ If a defendant intentionally creates the "conflict of interest" between himself and his attorneys as the means to force counsel out of the case, the form of the contrivance is immaterial; it may be defendant's verbal abuse; it may be

defendant's physical threats; it may be charges filed against the attorneys with the Court or the Bar Association; or, as here, it may be a sham lawsuit. Regardless of the means employed, such tactics are insufficient to secure a change of counsel. To decide otherwise would render the Court a supine victim of an astute and clever defendant.

Because defendant has intentionally created the apparent "conflict of interest", he can resolve this dilemma by conducting himself with common courtesy and ordinary politeness. He must understand that it is the responsibility of counsel to make decisions about tactics and strategy and the utilization of available time and resources in preparing for the various proceedings. Moreover, defendant must appreciate that counsel is not required to consult with him every day as a matter of rigid routine nor prepare daily reports.

If defendant persists in his present course of conduct making it impossible for honorable, self-respecting attorneys to represent him, it may well be that his actions would amount to a waiver of the right to the assistance of counsel. See, Glenn v. United States, supra, 303 F.2d at 540–541. That question need not be presently decided.

Although counsel may find it extremely difficult and emotionally taxing to perform their professional services under the circumstances, they must do the very best they can. The Court is confident to the point of moral certainty that, despite Birrell's ploy of suing his assigned counsel, The Legal Aid Society, through its attorneys, will continue to represent him with skill and devotion.

This decision is based upon the entire official record of proceedings to date including the present motion papers; the Court's actual experiences with and observations of the activities, oral and written, of defense counsel in behalf of the defendant both in the courtroom and at conferences; the Court's observations of the efficiency and zeal displayed by defense counsel; and the Court's observations of the manner in which defense counsel have deported themselves with respect to the defendant and vice-versa.

On the basis of the foregoing facts and circumstances, the Court finds and concludes:

(1) That defense counsel herein have rendered adequate, efficient and dedicated representation in behalf of the defendant as his counsel;

(2) That such professional services were rendered and accomplished despite defendant's deliberate lack of cooperation, discourtesies and attempts to assume primary management and control of the defense, and

(3) That, notwithstanding the spurious lawsuit instituted by the defendant against defense counsel and defense counsel's reaction thereto as stated in their moving affidavits in connection with this motion, defense counsel will henceforth be able effectively to represent defendant in the matters now pending before the Court.

In order to prevent a flagrant miscarriage of justice and a disruption of the actively pending proceedings, the Court denies the motion of assigned counsel to be relieved of further responsibility in this case. The defendant's motion to dismiss defense counsel (the Court assumes that defendant has either renewed his own motion to dismiss defense counsel or has joined in the motion by defense counsel to the extent that the latter seek to withdraw from the case) is also hereby denied.

So ordered.